UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

LARRY CAILLIER II            CRIMINAL NO. 10-CR-76(01)
                                CIVIL ACTION NO. 12-CV-2545

VERSUS                    JUDGE HAIK

UNITED STATES           MAGISTRATE JUDGE HANNA

**REPORT AND RECOMMENDATION**
(Rec. Doc. 85)

Pending before this Court is Larry Caillier II's motion, brought pursuant to 28 U.S.C. §2255, to vacate, set aside, or correct his sentence. [Rec. Doc. 85]. The matter was referred to the undersigned for review, report, and recommendation in accordance with the provisions of 28 U.S.C. §636 and the standing orders of this Court. The Government was served and filed an answer as well as a memorandum in response to the motion. [Rec. Doc. 89]. Caillier filed a Reply Memorandum in support of the motion. [Rec. Doc. 91]. An evidentiary hearing was held on December 4-5, 2013 at which Caillier, the victim, her mother, the Government's case agent and multiple attorneys for the defendant testified. [Rec. Docs. 111, 112]. Post hearing briefing was ordered. Briefs from the Government and the defendant were received on February 3, 2014. [Rec. Docs. 113, 114]. For the following reasons, it is recommended that the motion be granted in part and denied in part.

## *Factual Background and Procedural History*

On February 26, 2010, Caillier was arrested based on a complaint.  At his initial appearance he was represented by his retained attorney, Elbert Guillory. [Rec. Doc. 6]. The Government moved for detention and a detention hearing was set for March 3. On March 1, Lester Gauthier, Jr. also enrolled as retained counsel for the defendant. [Rec. Doc. 8-9].  Caillier was ordered detained by Magistrate Judge Hill. [Rec. Doc. 11, 17]. On March 9, the grand jury returned an indictment  charging Caillier with one count of production of child pornography, in violation of 18 U.S.C. §2251(a); one count of using a facility in interstate commerce to attempt to coerce a minor to engage in criminal sexual acts, in violation of 18 U.S.C. §2422(b), and one count of possession of child pornography, in violation of 18 U.S.C. §2252A(a)(5)(B). [Rec. Doc. 18]. On March 10, Caillier appealed the order of detention. [Rec. Doc. 23]. On March 16, Caillier was arraigned, pled not guilty to all counts, and the detention order was continued by the undersigned. [Rec. Doc. 26]. On March 19, Mr. Gauthier filed a motion to withdraw as counsel in which he disclosed he was retained solely for the purpose of representing Caillier at the detention hearing and filing objections to that ruling. [Rec. Doc. 31]. The motion was granted and Mr. Guillory remained as retained counsel. [Rec. Doc. 31-32].

On April 14, 2010, the district court held a hearing on the appeal of the

detention order originally issued by Magistrate Judge Hill and the ruling was affirmed. [Rec. Doc. 37]. At that hearing, in addition to Mr. Guillory, attorney Daniel Stanford  appeared as counsel for Caillier.  [Rec. Doc. 37]. Although the minutes reflect that attorney Edward Lopez also appeared as counsel, [Rec. Doc. 37], the transcript of the hearing does not bear that out.  The district court recognized Mr. Lopez as counsel present with the defense in the courtroom, but beyond saying "Yes. Morning, Your Honor",  Mr. Lopez did not enroll. [Rec. Doc. 115, p. 2].  He did not sign any pleadings, his name never appeared as having been provided copies of any pleadings and he does not appear as counsel for the defendant anywhere else in the record. The same day, trial was set for July 19, 2010.

On June 16,  Mr. Stanford filed a motion to suppress, generally challenging the truthfulness of statements contained in the affidavit used to support a search warrant for the cellular phones of Caillier and the victim, a high school student who was his student.  [Rec. Doc. 39]. The affidavit contained statements made by the victim to another student who reported the victim's statement to law enforcement. Those statements were repeated in the complaint and were corroborated by the victim. [Rec. Doc. 1-1].   On July 2, before the motion was ruled on, a change of plea hearing was scheduled for July 6. [Rec. Doc. 42].

On July 6, 2010, pursuant to a written plea agreement, a bill of information

-3-

charging Caillier with one count of receiving child pornography, in violation of 18

U.S.C. §2252A(a)(2)(A) was filed, to which Caillier pled guilty. [Rec. Doc. 43-45].

The plea was entered before Magistrate Judge Michael Hill with Caillier's consent.

Representing Caillier at the plea hearing were Messrs. Stanford and Guillory. [Rec.

Doc. 44-50].  The Factual Basis for Plea of Guilty, submitted with Caillier's plea

agreement, which was signed by Caillier, Stanford and Guillory, contained the

following language:

> The defendant, LARRY CAILLIER II, was a teacher at Opelousas High
> School.  In February of 2010, the defendant, LARRY CAILLIER II,
> approached a 15 year old student at the school.  Using a cell phone and
> the Internet they began to text.  During their texting the defendant asked
> the minor for sexually explicit images of herself.  The defendant told her
> not to take pictures of her face, because that is how he could get in
> trouble.
>
> At the defendant's request the minor took several images of herself
> including sexually explicit images and sent them to the defendant.
> Those images traveled in interstate commerce.  Those images were sent
> from the victim to the defendant on February 8, 2010.  All of the above
> occurred in the Western District of Louisiana.

[Rec. Doc. 50-2].

In the plea colloquy, the following exchange took place:

| THE COURT: | Did you, as charged in the Bill of Information, receive child pornography in interstate commerce? |
|---|---|
| THE DEFENDANT: | Yes, sir, Your Honor. |
| | *     *     * |
| THE COURT: | You have read the factual basis, Mr. Caillier? |

| THE DEFENDANT: | Yes, sir, Your Honor. |
|---|---|
| THE COURT: | You have signed it indicating your agreement to the factual basis? |
| THE DEFENDANT: | Yes, sir, Your Honor. |
| THE COURT: | As we stand here today, do you have any objection or differ in any way from the factual basis which has been signed by you and submitted to the Court by the government? |
| THE DEFENDANT: | No, sir, Your Honor. |

[Rec. Doc. 43, p. 20].

Caillier, Stanford and Guillory also signed an Affidavit of Understanding of Maximum Penalty and Constitutional Rights, which included Caillier's confirmation that he had been furnished a copy of the charge against him, that he understood the charge, and that the court had addressed him personally as to the maximum possible penalty that may be imposed against him. The maximum penalty[1] was set out on the face of the affidavit, and it was read aloud by the court at the plea hearing. [Rec. Doc. 43, p. 15]. Also appearing on the affidavit were the following declarations:

> I realize that by pleading guilty I will stand convicted of the crime charged and thereby waive my privilege against self-incrimination, my right to jury trial, my right to confront and cross-examine witnesses, and my right of compulsory process.

> I further state that my plea in this matter is free and voluntary, and that it has been made without any threats or inducements whatsoever

---

[1]A term of imprisonment of not less than five (5) years nor more than twenty (20), a fine of not more than $250,000.00, or both, a term of Supervised Release of not less than five (5) years nor more than life in length in addition to any term of imprisonment imposed by the Court, and a $100.00 special assessment fee. [Rec. Doc. 50-1].

from anyone associated with the State or United States Government, and that the only reason I am pleading guilty is that I am in fact guilty as charged.  The Court has given me the opportunity to make any statement desired.

[Rec. Doc. 50-1].

As to the issue of sentencing, the following colloquy occurred:

THE COURT:          Do you also understand that after it has been determined what guideline applies to a case, the district judge has the authority in certain cases and in some circumstances to impose a sentence that is either more severe or less severe than the sentence called for by the guidelines?

THE DEFENDANT:      Yes, sir, I do understand that, Your Honor.
                              *      *      *
THE COURT:          Do you understand that if the sentence is more severe than you expect, you will still be bound by your plea and you will have no right to withdraw it?

THE DEFENDANT:      I understand that, too, Your Honor.

THE COURT:          Has anyone made any prediction, prophecy, or promise to you as to what your sentence will be?

THE DEFENDANT:      No, sir, Your Honor.

[Rec. Doc. 43 pp. 19-20].

A Pre-Sentence Report (PSR) was prepared and approved on September 3, 2010. [Rec. Doc. 74]. Contained within the report are seven paragraphs of factual accountings of "The Offense Conduct" including statements of the victim which are consistent with the statements in the affidavit provided in the application for search warrant as well as the complaint. [Rec. Doc. 74, pp. 4-5, ¶¶ 7-13]. On September 22, Mr. Stanford filed objections to those seven paragraphs of the PSR as factually

-6-

inaccurate and not supported by the evidence. [Rec. Doc. 74, p. 14]. The Probation Office responded that the information in paragraphs 7-13 was "supported by investigative reports presented by the Government and reviewed by the Probation Office. Additionally, information contained in these paragraphs support, in part, information contained in the 'Factual Basis' entered into by the defendant, his defense counsel and the Government, prior to the Court accepting the defendant's plea of guilty on July 6, 2010." [Rec. Doc. 74, p. 15].

Rather than applying the guideline calculations found in  U.S.S.G. §2G2.2, or recommending the statutory mandatory minimum of 60 months, the PSR set forth a guideline range of 168-210 months under U.S.S.G. §2G2.1, based on the cross reference in U.S.S.G. §2G2.2(c)(1) which applies "if the offense involved causing, transporting, permitting or offering or seeking by notice or advertisement, a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct. . . .". [Rec. Doc. 74]. Mr. Stanford also objected to the guideline calculation on the basis that the facts did not show that Caillier "caused" the victim to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct, rather, he asked her to send photographs. [Rec. Doc. 72, pp. 3-11]. The response of the Probation Office was that the defendant's request that the victim take sexually explicit photographs of herself met the standard contained in the cross

-7-

reference of §2G2.2(c)(1). [Rec. Doc. 74, p. 16].

At the time of sentencing on November 30, 2010, Mr. Stanford withdrew the factual objections to ¶¶ 7-13 of the "Offense Conduct" contained in the PSR. [Rec. Doc. 63, p. 1-2; Rec. Doc. 72, p. 3]. After arguments, the legal objection to the application of the cross reference in the guidelines calculation was overruled as follows:

> Based on the investigative reports and the factual basis for the defendant's guilty plea, the Court finds that the cross reference found in Section 2G2(c)(1) of the guidelines was properly used. The information before the Court shows that the defendant requested sexually-explicit images from the victim who was his student.

[Rec. Doc. 72, p. 11-12, Rec. Doc. 63].

Both of Caillier's attorneys argued for a downward departure from the sentencing guidelines range based on the facts of the case. [Rec. Doc. 72, p. 12, 18-19]. Caillier also addressed the court before sentencing. [Rec. Doc. 72, pp. 15-17]. Afterwards, Caillier was sentenced to 168 months imprisonment, the lower end of the guidelines range, to be followed by 15 years supervised release. [Rec. Doc. 72, pp. 23-25].

After his sentence was imposed, Caillier asked to "say one final thing." Citing a dispute he had with defense counsel over whether to withdraw the factual objections to the PSR, Caillier asserted for the first time that he had not, in fact, asked the victim

to take sexually explicit pictures of herself, rather, she sent the images to him on her own initiative, that statements contained in the factual basis he signed at the time of the plea colloquy were not true and that he was advised by his counsel to allow the misrepresentation at his guilty plea as part of the compromise reached with the Government. [Rec. Doc. 72, pp. 26-38].

When specifically questioned whether he was asking the court to allow him to withdraw his guilty plea, Caillier responded "For the truth of the matter, Your Honor." [Rec. Doc. 72, p. 36].  After having already explained why and how the cross reference was applied and sentence having already been imposed, the district court granted Caillier ten days within which to file a motion to withdraw his guilty plea. [Rec. Doc. 72, pp. 36-44]. Further, since defense counsel could be potential witnesses in any proceedings for withdrawal of the guilty plea, the district court referred the matter to the Federal Public Defender's Office for appointment of counsel to advise Caillier regarding the filing of such a motion. [Rec. Doc. 53, 72, pp. 44-46].

On December 13, 2010, Caillier filed, with assistance from Assistant Federal Public Defender Wayne Blanchard, a Notice of Intent Not to File Motion to Withdraw Guilty Plea and Request for Clarification of Status of Counsel. [Rec. Doc. 55]. In that filing, he confirmed his discussions with his newly appointed counsel regarding "both legal and factual considerations"  leading to his decision not to file a motion to

withdraw his guilty plea.  He asked for clarification regarding the status of his legal

representation, "for appellate purposes," specifically whether his retained attorneys

had been permanently relieved. [Rec. Doc. 55].

On January 14, 2011, the district court ordered that the Judgment and Sentence

imposed on the defendant on November 30, 2010 be entered, noting:

> Subsequent to the imposition of sentence, the defendant alleged that he
> was not guilty of the crime for which he was sentenced. Although he
> acknowledged during his Plea Hearing held on July 6, 2010 that he was
> Guilty of Count 1 of the Bill of Information charging him with Receiving
> Child Pornography in violation of 18 U.S.C. section 2252a(A)(2)(A) (sic)
> and that every element in the Factual Basis for Plea of Guilty, as well as
> the entire Plea Agreement, was true and correct, he alleged after being
> sentenced that he was coerced by his attorneys into pleading guilty.

[Rec. Doc. 62].

Judgment was entered on January 24, 2011. [Rec. Doc. 64]. Mr. Blanchard filed

a Notice of Appeal on January 26, 2011. [Rec. Doc. 67]. On January 27, Mr. Chris

Aberle was substituted as counsel in place of Mr. Blanchard.  The sole issue raised on

appeal was whether the photographic images of the victim Caillier received on his

cellular phone constituted child pornography so as to support a factual basis for the

guilty plea. [Rec. Doc. 85, p. 3].  Despite the assertions in this motion that he

requested the sentence be challenged by his attorney, Caillier did not raise any of the

issues discussed at his sentencing nor did he challenge the sentencing guideline

-10-

computation on appeal.  The appellate court affirmed Caillier's conviction and sentence, and the Judgment was issued as a mandate on October 18, 2011. [Rec. Doc. 78].

On May 5, 2012,  Mr. Dmitrc Burnes enrolled as retained counsel. On September 24, 2012, Caillier filed the §2255 motion presently before the Court. In addition to the grounds raised in support of the motion, there is what is purportedly an affidavit of the victim in which she attests that Caillier did not ask her to send the pictures that she sent to him. Rather, she sent them on her own and did not realize they would be considered  pornography. [Rec. Doc. 85-3].

Since Caillier pled guilty, the victim did not testify but her affidavit executed March 21, 2012, does contradict statements attributed to her in the application for search warrants, the complaint and the PSR. In its entirety, it reads as follows:

> I, _____, was in Larry Caillier's 10th grade class.  While there, I took and sent pictures of myself on my own and Mr. Caillier did not ask me for the pictures.  He was a popular teacher, and many of the girls had crushes on him.  He was funny.
> When I sent the pictures, I did not realize that they were considered porn, and never had the intention of them being classified as that.  Caillier never touched me or asked me to meet him, and never had any requests for me to act innappropriately[sic] with him.
> I took his kindness as more than it was, and this mistake ended up getting a good man in bad trouble.  I feel like the federal officers were really pushy when they tried to get information out of me.  They showed up at my house very early in the morning and shocked me.

[Rec. Doc. 85-3, p. 1].

-11-

### Issues Presented

Although styled as a motion to vacate, set aside, or correct a sentence, in the petition and in brief Caillier argued the Court should set aside the conviction and sentence and  requested an evidentiary hearing. [Rec. Doc. 85, p. 14, 85-2, p. 25]. Caillier raised five grounds upon which he claims relief is warranted:

(1)  Because the four photographic images found in Caillier's cellular telephone  do not constitute child pornography, he pled guilty to a crime that does not exist;

(2)  The cross reference in U.S.S.G. §2G2.2(c)(1) was incorrectly applied;

(3)   Ineffective assistance of counsel as to the attorneys who represented Caillier at the district and appellate courts;

(4)  Actual innocence; and

(5)   Prosecutorial misconduct  based on the Government's failure to allow Caillier's attorneys access to the victim.

Whether the defendant is entitled to an evidentiary hearing rests upon a two part inquiry.  As the Fifth Circuit has instructed:

> A §2255 motion 'can be denied without a hearing only if the motion, files, and records of the case conclusively show that the prisoner is entitled to no relief.' *Bartholomew*, 974 F.2d at 41; accord *Friedman v. United States*, 588 F.2d 1010, 1014-15 (5th Cir.1979); see also 28 U.S.C. § 2255 (2000). See generally *Machibroda v. United States,* 368 U.S. 487, 494-96, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962). The determination of whether to conduct a hearing on a § 2255 motion involves two steps. See

*Friedman*, 588 F.2d at 1015. First, the court examines whether the record conclusively negates the factual predicates asserted in support of the motion. *Id.* If not, the court next determines whether the movant would be entitled to relief if his factual allegations are true. *Id*. If he would be entitled to relief, then the district court must conduct a hearing to ascertain the validity of the movant's factual assertions.

*United States v. Alanis,* 88 Fed. Appx. 15, 19 (5th Cir. 2004)*.*

Given the affidavit submitted by the victim and the representations made by Caillier regarding his plea and the lack of appeal of his sentence, the record does not conclusively show that he is entitled to no relief. Further, this Court does not find that the record conclusively negates the factual predicates asserted in support of the motion, and therefore, the request for an evidentiary hearing was granted.

### *The Evidentiary Hearing*

At the hearing, the victim was identified as "Miss C." in order to protect her identity.  She authenticated her affidavit but could not recall if she was actually placed under oath. [Rec. Doc. 111, pp. 13-16].  Although she testified that the statements in her affidavit were truthful, this Court questions her credibility and motivation. She described her first statements to law enforcement officers as a "bad choice of words." [Rec. Doc. 111, p. 15].  When she realized that Caillier "got a sentence that was like very unfair", she "wanted to do anything to help." [Id.] Miss C.'s mother testified that Miss C. was upset at the sentence and wanted to "help him get his time reduced

-13-

because she felt it was just too much. " [Rec. Doc. 111, p. 125].  Miss C. And her mother approached Mr. Lopez to see if "there was anything [they] could do to help reduce Mr. Caillier's time" and the affidavit was prepared in an attempt to accomplish that. [Id.]

Miss C. testified that Caillier never "specifically" asked her to send the four pictures found on his cell phone which she admitted taking. [Rec. Doc. 111, p. 18]. She testified she saw "suggestive" pictures of women on Caillier's cell phone at school near the end of class which Caillier did not hide from her view. [Rec. Doc. 111, pp. 27, 43-44, 52]. As she was walking out, she "thought" she heard him say "something along the lines of 'your turn'". [Rec. Doc. 111, pp. 28, 45-46, 52].  She assumed it meant it was her turn to send pictures but did not clarify that with him. [Id.] She testified she wrote down Caillier's cell number from a phone on his desk before the "your turn" comment, but she was not certain if it was before or after she was shown the photographs on the phone. [Rec. Doc. 111, pp. 52-53,55, 60-61]. She testified that she assumed Caillier left the phone number up on purpose but he did not actually tell her it was his number. [Rec. Doc. 111, pp. 55-56]. She went home, took the pictures of herself and sent them to his cell phone. [Rec. Doc. 111, p. 28]. Caillier responded by sending her an image of a penis. [Rec. Doc. 111, pp. 28-29, 36-37]. Miss C. did not deny her statements to investigators that Caillier asked her to send

-14-

fully naked pictures after the first exchange, rather, she testified she did not remember that happening. [Rec. Doc. 111, pp. 20-21, 29, 36].

The Government was able to retrieve only four images from Caillier's cell phone that came from Miss C. Telephone records of Miss C.'s cell phone introduced into evidence as Government Exhibit 3 indicate the first "MMS" message was sent by her to Caillier on February 5 at 4:40 p.m.[2]  On that date, she sent a total of eight MMS messages over the next hour.  These were only the first of a total of thirteen MMS messages sent by Miss C. to Caillier's cell phone over a period of six days but it was not possible to discern when the four images that were recovered from Caillier's phone were sent based on the cell phone records. [Rec. Doc. 111, pp. 93-95]. The same day, at 21 minutes after 7 p.m.,  Caillier sent one MMS message to her cell phone - the only MMS message he sent - which contained the image of a penis. In the interim, numerous SMS text messages were exchanged.

On Sunday, February 7, numerous SMS text messages were exchanged and two more MMS messages were sent by Miss C. to Caillier.   The last SMS text message sent by Miss C. to Caillier on February 7 was at 7 minutes before 11 p.m.

---

[2]     Typically, a strictly text message is transmitted by "SMS" which is an acronym for Short Message Service.  Multimedia Messaging Service "MMS" is a way to send messages that include multimedia content, i.e. photographs, videos, or audios to and from mobile phones. [Rec. Doc. 111, pp. 98-99].

The following morning, Monday, February 8, at 18 minutes before 8 a.m. Caillier initiated contact with Miss C. by SMS text message. Numerous SMS text messages were exchanged throughout the school day ultimately concluding at 18 minutes before 6 p.m.  The next day, February 9, Caillier once again initiated contact with Miss C. at 27 minutes past 8 a.m. Numerous SMS text messages were exchanged throughout the school day and evening with the last SMS text message coming from Miss C. to Caillier at  approximately 10 minutes before midnight. In addition, Miss C. sent three more MMS messages to Caillier that day.

On February 10, Miss C. initiated contact with Caillier by SMS text message at 9:48 a.m. Numerous text messages were exchanged throughout the school day and afterwards, with the last SMS message sent to Miss C. by Caillier at 9:39 p.m.   The following morning, at 6:41 a.m.,  Miss C. sent the last SMS text message to Caillier that is identified in the record.  According to her mother, it was Miss C. who put an end to the communication with Caillier because she thought it best that they stop communicating by phone. [Rec. Doc.111, p. 126].

During the time frame from Friday, February 5, to Thursday, February 11, a total of seventeen MMS messages were sent to/from Miss C.'s cell phone. Only two were sent to her phone and one of those came from Caillier - consistent with the evidence that he sent her an image of a penis. Of the remaining fifteen, all but two

were sent by Miss C. to Caillier. There were over two hundred SMS messages that were exchanged between Miss C. and Caillier over the same time frame.

In her statement to investigators given fifteen days after the last message was sent, Miss C. stated that Caillier showed her pictures on his cell phone of a male and female engaged in a sexual act and a photograph he represented as being of his penis. [Gov't. Ex. 2 - sealed].  After discussions about her sending him text messages of herself unclothed, Miss C. quoted Caillier as saying "you can send me pictures because you saw mine." [Id.] Miss C. told the investigators that she had sent three or four MMS photographs of her breasts and that the photographs did not contain pictures of her face because she was directed by Caillier to leave her face out of the photograph so they would not get in trouble if the photographs were discovered. [Id.] Miss C. also told investigators that Caillier asked her to send full body nude photographs of herself as well as her vagina, but she refused. [Id.] She stated it surprised her when Caillier asked her to send nude pictures of herself. [Id.] Miss C. also stated Caillier sent her a photograph, via MMS, of his penis. [Id.]

Investigators also interviewed a friend of Miss C. identified as Miss A. for purposes of the hearing. Miss A's. statements to investigators as to what she was told by Miss C. are consistent with the statements Miss C. gave to investigators rather than the testimony of Miss C. at the hearing. [Gov't. Ex. 1 - sealed]. Specifically, Miss A.

-17-

stated that Miss C. said Caillier had shown her pornographic pictures and videos on his cell phone that depicted him and females. [Id.]  Miss A. stated she was told that Caillier and Miss C. exchanged phone numbers and began exchanging photos. [Id.] Miss A. corroborated Miss C.'s statements to investigators that Caillier asked her to send nude photos of herself and that she had been instructed not to send pictures of her face so as not to be able to identify herself and get him in trouble. [Id.] Miss A. had also received from Miss C., via MMS message, the image of the penis sent to her by Caillier. [Id.]  Miss A. stated that Miss C. was told by Caillier that he liked the photos she had sent and wanted her to send more. [Id.]

The four photographs that were recovered from Caillier's cell phone were shown to Miss C. in a second interview. She confirmed she sent them to Caillier because he asked them to send them. [Gov't. Ex. 1 - sealed; See also Gov't. Ex. 2].  Not all of the photographs that were recovered were of Miss C.'s breasts. [Id.] She also stated when he received the photographs, he requested that she send him sexually explicit photos of her full body to include her vaginal area. [Id.] Thus, although she did not remember Caillier doing so at the time of the hearing, on two separate occasions shortly after the events at issue had transpired, with different federal agents, Miss. C. stated that

Caillier asked her to send him pictures of her fully naked.[3]

In the statements of Miss C. and Miss A., investigators reported that Caillier had inquired whether Miss C. would sneak out of her house which she interpreted to mean for possible sexual reasons. [Gov't. Ex. 1, p. 4, Gov't. Ex. 2, p. 4; Rec. Doc. 111 pp. 83-84]. In her testimony, Miss C. denied that Caillier asked her to sneak out of her house, but she thought he asked her if she ever did sneak out of her house. [Rec. Doc. 111, p. 30].

Caillier's retained counsel, Mr. Guillory, testified that he became involved in the representation of Caillier, his great nephew, moments before the arrest and was counsel of record through the time of sentencing. [Rec. Doc. 111, pp.129-130]. He testified he was involved in the plea negotiations which ultimately led to a plea of guilty to the charge of receiving child pornography in exchange for a dismissal of the three counts contained in the indictment. [Rec. Doc. 111, p. 130]. He believed that to be advantageous for Caillier because it gave him the "best opportunity for the smallest sentence." [Rec. Doc. 111, pp. 131-133].[4]

---

[3] The testimony of the case agent, Erol Catalan, concerning the interviews is consistent with the information contained in Gov't. Exs. 1 and 2. [Rec. Doc. 11, pp. 77-84].

[4] The maximum possible penalties for the three counts in the indictment are: on Count I, Production of Child Pornography (18 U.S.C. §2251(a)), a minimum mandatory sentence of 15 years up to 30; on Count II, Using a Facility in Interstate Commerce to Attempt to Coerce a Minor to Engage in Criminal Sexual Acts (18 U.S.C.

Mr. Guillory testified that there were no discussions in the plea negotiations about the sentence that Caillier would receive but that Guillory's "goal" was a maximum of five years which he discussed with Caillier. [Rec. Doc. 111, p. 132]. He testified he discussed the guidelines "at great length" with Caillier before the plea agreement - a point Caillier admitted at the time of the plea colloquy. [Rec. Doc. 111, p. 133; Joint Ex. 4, p. 3; Joint Ex. 5, pp. 18-19]. According to Mr. Guillory, he was "certain" that the cross reference was discussed and that Caillier understood under the guidelines he "could have a sentence that would have significant weight." [Rec. Doc. 111, pp. 133-134]. When the PSR was received in which application of the cross reference was recommended, Mr. Guillory testified Caillier did not express surprise because "[w]e were aware that that was a possibility, and it was a possibility that had been discussed." [Rec. Doc. 111, pp. 134-135].

Guillory provided the specifics to the decision making process as follows:

> We had a teacher and a 15-year-old student. We had more than 200 text messages between client and alleged victim over a long weekend. We had several photographs sent by text message back and forth. We had a statement that was given to officers and to at least one civilian indicating

---

§2422(b)),  a minimum mandatory sentence of 10 years up to life; and on Count III, Possession of Child Pornography (18 U.S.C. §2252A(a)(5)(B)), up to ten years. The charge to which Caillier pled guilty, Receiving Child Pornography (18 U.S.C. §2252A(a)(2)(A), carries a minimum mandatory term of 5 years up to twenty. All of the charges carry a possible $250,000 fine and supervised release for at least 5 years up to life.

that there were discussions about sneaking out of home for sexual purposes. Given all of those – and we had three very serious charges that we received under indictment.

Looking at all of that and understanding that we were facing a jury trial, not where lawyers would dissect the fine points of lascivious exhibition, but where lay people would make a decision, a factual determination about all of these circumstances, given all of those circumstances, we recognized that it was by far beneficial to negotiate a plea understanding that there was this cross reference that could raise us significantly beyond our goals, understanding that we had goals that had nothing to do with anything other than our desire to reach a certain goal, but that the judge was not committed to any goal and we were not guaranteed any outcome and no one else did either.

Taking all of that into consideration, we did what we thought was the prudent thing to do. The most prudent thing to do under those circumstances was to avoid a trial by lay people in this district with those circumstances.

[Rec. Doc. 111, p. 136].

Mr. Guillory categorically denied promising Caillier he would only get five years or that he should lie to the court. [Rec. Doc. pp. 144-145]. Mr. Guillory testified that they discussed the guideline possibilities, that the judge alone was the sole decider on sentencing, and in response to a specific question he posed to his client, that Caillier admitted he asked Miss C. to send him photographs. [Rec. Doc. pp.140-141, 144-147]. Mr. Guillory also verified the truth of the entire Stipulated Factual Basis based on conversations he had with his client during the time up to and leading to the

execution of the plea agreement. [Rec. Doc. 111, pp.148-149].

Attorney Edward Lopez testified that, although he was "involved" in the representation of Caillier, he was there "just to assist the attorneys that were really involved in the case," Guillory and Stanford, "as a favor to the family," that "he was not [Caillier's] lawyer of record" and that he "deferred to Mr. Guillory." [Rec. Doc. 111, pp. 153, 156, 170, 172]. Mr. Lopez testified that he did not "think that [he] ever sat at counsel table –because [he] wasn't counsel." [Rec. Doc. 111, p. 171]. However, he also testified that he was "in the role" as one of Caillier's attorneys. [Rec. Doc. 111, p. 186].

Except for one occasion when Mr. Stanford was present, Mr. Lopez could not recall being with Caillier in the presence of his retained counsel. [Rec. Doc. 111, p. 154]. Mr. Lopez testified that Caillier "always maintained" that he did not ask Miss C. to send photographs. [Rec. Doc. 111, p. 155].  However, Mr. Lopez was not involved in any plea negotiations as Mr. Guillory was "completely" responsible for plea negotiations, he was not involved in the process of preparing the factual basis supporting the plea, and he was not present at the time of the plea. [Rec. Doc. 111, pp. 156, 158, 168, 170].  Mr. Lopez agreed that it was Mr. Guillory's job to assess the evidence, talk to Caillier to assess his guilt or innocence, and to make an assessment about possible pleas that could or could not be given. [Rec. Doc. 111, pp. 169-170].

In response to an inquiry as to what was his opinion that Caillier was pleading guilty after having been told that Caillier did not ask for the photographs and that, in Mr. Lopez' opinion, the photographs at issue did not constitute child pornography, Mr. Lopez testified: "Well, obviously he was facing some serious – I think the indictment was – it was a three-count indictment if I'm not mistaken. Some of them were a lot more – the charges were more serious than possession of child porn. And I think that, you know, since I was not lead counsel, I deferred to Mr. Guillory. It's Mr. Guillory's family, so I assumed that he was not only protecting his family, but protecting the defendant and was doing the best thing, the right thing." [Rec. Doc.111, p. 156].

Mr. Lopez never testified that he, or anyone else, told Caillier to plead guilty to something he did not do or to lie about what he did in order to get a more favorable sentence.  He did acknowledge that it "happens" that a defendant will initially profess innocence, and as they begin to acknowledge things they did, will end up pleading guilty. [Rec. Doc. 111, p. 168].

Mr. Lopez testified that he discussed the application of the guidelines with Caillier. [Rec. Doc. 111, p. 156]. Mr. Lopez did his own guideline calculation which was less than five years and he told Caillier that was impossible since there was a five year minimum. [Rec. Doc. 111, p. 157-158]. In his guideline computation,  he did not take the (c)(1) cross reference into account. [Id.]  Although Mr. Lopez testified that

he "told that man he's getting five years," he also testified that he told Caillier the judge was in charge of sentencing, he knew that Caillier could get more than five years and up to twenty, and that he was "sure that was explained" to Caillier.  [Rec. Doc. 111, p. 167].  Mr. Lopez testified that Caillier's negative response to the question by the court - "[H]as anyone made any prediction, prophecy, or promise to you as to what your sentence will be?" - was not true as he had made a prediction as to Caillier's sentence. [Rec. Doc. 111, p. 174]. However, Mr. Lopez was not present at the time of the guilty plea.

Mr. Lopez also testified that he did not hear any other figure but five years from anyone, including Mr. Guillory and Mr. Stanford. [Rec. Doc. 111, pp.184-185]. However, Mr. Lopez did not remember ever being present when Mr. Guillory and Caillier were discussing the facts of the case. [Rec. Doc. 111, p. 154]. Mr. Lopez specifically denied that Mr. Guillory ever described a sentence that would be part of a plea agreement in the "nature of like a pure plea bargain." [Rec. Doc. 111, 159].

Mr. Lopez became aware of the application of the (c)(1) cross reference when he received the PSR. [Rec. Doc. 111, p. 187-188].  He testified Mr. Stanford prepared the objections to the factual statements, and although he saw them, he had no participation in the decision or discussions to withdraw them. [Rec. Doc. 111, pp. 172, 188].

-24-

Daniel Stanford testified that he was retained to prepare and get the case ready for trial. [Rec. Doc. 111, p. 191]. He was not involved in the plea negotiations as that was left to Mr. Guillory. [Rec. Doc. 111, p. 192]. During his interactions with Mr. Lopez working on the case, Mr. Stanford thought that Mr. Lopez was acting as one of Mr. Caillier's attorneys. [Rec. Doc. 111, p. 200].

Mr. Stanford testified that Caillier stated that which was contained in the Government's investigative report submitted in discovery by Agent Catalan "was inaccurate as it pertained to Miss C. and Miss A", that he did not ask for the photographs from Miss. C, that what was in the investigative report was not true. [Rec. Doc. 111, p. 191]. However, Caillier testified he had not seen the investigative report until the day of the evidentiary hearing, rather, he had seen the criminal complaint and notes of an interview of Miss C. [Rec. Doc. 112, p. 69].

Mr. Stanford testified he never met with Caillier and Mr. Guillory together, however, he was present when Mr. Lopez had a discussion with Caillier about how the sentencing guidelines applied. [Rec. Doc. 111, pp.192, 196]. When specifically questioned whether there was "any particular number given to Mr. Caillier as to what he might expect to see," Mr. Stanford responded, "No. The only particular number was that it was a five-year mandatory minimum sentence." [Rec. Doc. 111, p. 193]. In follow-up, Mr. Stanford was asked if he ever heard someone tell Caillier that the five

year mandatory minimum was what he should expect to see, Mr. Stanford responded he did not. [Id.] Mr. Stanford verified that he did not hear anybody, during the time he represented Caillier, promise Caillier a five year sentence and  that he believed Caillier's statement at the time of the plea colloquy that nobody made any promises or predictions as to what his sentence might be was true.  [Rec. Doc. 111, 200-202].

Mr. Stanford testified he never did his own guideline calculation and he never discussed the (c)(1) cross reference with Caillier. [Rec. Doc. 111, pp. 193-194]. However, after receiving the PSR and prior to sentencing, Mr. Stanford discussed the (c)(1) cross reference with Caillier in preparing the objections to the PSR. [Rec. Doc. 111, p. 194].  Mr. Stanford testified Caillier was shocked, that he could not understand how the cross reference would apply to the facts of his case and he stated that nobody discussed the cross reference with him. [Id.].  Mr. Stanford confirmed that the cross reference did not come up in his presence when Mr. Lopez discussed the guidelines with Caillier but could not testify as to what Mr. Guillory discussed with Caillier. [Id.]

Mr. Stanford testified that he prepared the objections to the PSR based on person-to-person discussions with Caillier in which Caillier stated the facts set forth in the PSR were wrong. [Rec. Doc. 111, p. 195].  In court, prior to the sentencing hearing, the factual objections were withdrawn with Caillier's consent because of a concern that Caillier would lose credit for acceptance of responsibility. [Rec. Doc.

111, p. 196-197]. Mr. Stanford testified that even had the objections been maintained and the factual statements been removed, that would not have removed the factual basis for the guilty plea, however, it may have "had a significant effect" on the application of the cross reference. [Rec. Doc. 111, p. 204].

Mr. Stanford was specifically asked by this Court if he ever said or heard any lawyer tell Caillier to plead guilty to something he said he did not do. Mr. Stanford responded, "First, I never told Mr. Caillier – I would never tell a client to plead to something they did not do unless the plea was done pursuant to an *Alford* plea or a best interest plea. Number two, I did not hear anybody ever tell Mr. Caillier that he should plead guilty to something he didn't do." [Rec. Doc. 111, p. 206]. Mr. Stanford testified he had no reason to believe that any statement contained in the factual basis signed by Caillier, Mr. Guillory and him at the time of the plea colloquy was not true. [Rec. Doc. 111, pp. 206-207].

When Caillier spoke to the court after he had been sentenced and suggested he had been told to lie, the court gave him an opportunity to withdraw his guilty plea and appointed the office of the Federal Public Defender to represent him. Wayne Blanchard appeared in that capacity and testified at the hearing. According to Mr. Blanchard, the decision was made not to move to withdraw the plea based on a litigation strategy, the risks associated with a more adverse outcome and the likelihood

of success based on certain factors. [Rec. Doc. 111, pp. 214-217, 219, 223-224].
Among the factors was the possibility that the Government may have had an easier
time proving the original charge of solicitation which carried a mandatory ten year
sentence with a maximum of life. [Rec. Doc. 111, p. 216].   Another part of the
decision not to withdraw the guilty plea had to do with Caillier's desire to appeal his
sentence including the application of the (c)(1) cross reference. [Rec. Doc. 111, p.
220-223].

Mr. Blanchard filed a timely notice of appeal, but because he knew more
capable appellate lawyers, he contacted Chris Aberle to handle the appeal. [Id.] In
correspondence to Caillier, Mr. Aberle discussed that he would appeal the application
of the (c)(1) cross reference as requested by Caillier, but in fact, that did not happen.
(Deft. Ex. 2).

Finally, Caillier testified on his own behalf. This Court found his testimony to
lack credibility in multiple respects.

Caillier differed in his description of the incident in which Miss C. was shown
images on his cell phone.  He assumed she saw "risque" pictures of his girlfriend on
the Friday that Miss C. sent images to him because, while he was looking at the risque
images of his girlfriend and texting with her in the classroom, Miss C., who was
standing behind him, commented that "we all have things on our phones that we don't

-28-

want others to know about." [Rec. Doc. 111, pp. 231-232].  Caillier testified that, later that day, without asking for them, he received images to his cell phone of Miss C. which  he deleted immediately and then asked her not to send "anything else" to his phone. [Rec. Doc. 111, pp. 235-240]. This testimony is contradicted by his own statements, the statements given by Miss C. to investigators and the cell phone records.

Caillier testified *after* he received the four images from Miss C. on the afternoon of February 5 unsolicited, and *after* he found out it was Miss C., he sent her an image of a penis. [Rec. Doc. 111, pp. 237-241].  He testified he continued to exchange text messages with her that day and through the weekend including during the Super Bowl on Sunday, February 7. However, at school on Monday, February 8, he took  Miss C.'s cell phone, deleted his number from it and "never thought about the incident ever really again." [Rec. Doc. 111, pp. 242-244]. This testimony is also belied by the cell phone records discussed above which document ongoing exchanges of nearly two hundred SMS messages between the two of them and numerous MMS messages sent to him by Miss C. during each of the next three school days and into the night until the morning of Thursday, February 11. [Gov't. Ex. 3].

Caillier testified he called his sister to get in contact with Mr. Guillory when law enforcement agents showed up at his house for the first time. [Rec. Doc. 111, p. 249].

Contrary to the testimony of Mr. Guillory, Caillier testified he never told Mr. Guillory that he, Caillier, asked for photographs, rather, he specifically denied ever asking for them. [Rec. Doc. 111, p. 253]. Contrary to the testimony of all three attorneys, Caillier testified all three were present when he went over the factual basis and pointed out what he believed were statements that were not true - statements which he went over in detail at the evidentiary hearing. [Rec. Doc. 111, pp. 255-262, 264].

Contrary to the testimony of Messrs. Guillory and Stanford, Caillier testified he was promised and even guaranteed he would get five years. [Rec. Doc. 111, pp. 262-263, 266]. According to Caillier, when the plea packet was brought to him, Mr. Guillory stated the following about the sentence while all three attorneys were present:

> He told me pretty much that the power was up to the prosecutor, and that if they came up with a deal that guaranteed you five years, that in this day and age the prosecutors have more power than the judges. Therefore, if the prosecutor gives a range or makes a promise of something, that pretty much the judge is going to go with it.
>
> .    .    .
>
> And when I was reading the plea and recognized that a lot of this was false, I asked Mr. Guillory, I said, Mr. Guillory, I said, Elbert, isn't this perjury? And his response was, well technically, no it's not. You know, this is just how things work in the federal system. People plead all the time in the federal system to things they didn't do. Sometimes you have to plead to something that you didn't do to get the time that you want, that's promised to you by the government, and we've been given a promise that your sentence will not exceed five years. So I accepted his professional opinion of that as it being okay, that there wasn't an issue with that.

[Rec. Doc. 111, pp. 264-265].

These statements are not only contradicted by both counsel of record as well as

Mr. Lopez, they are contradicted by Caillier's statements made in the plea agreement

and at the time of the plea colloquy, under oath, that no prediction, promise or

prophecy had been made concerning his sentence and his understanding that the judge

alone decided his sentence. [Joint Ex. 4, pp.3-4; Joint Ex. 5, p. 18-19].

Caillier testified Mr. Guillory never discussed the guidelines with him, that it

was Mr. Lopez who did so, and that Mr. Lopez's calculations did not take the (c)(1)

cross reference into account. [Rec. Doc. 111, pp. 264-266].  Although Caillier did his

own calculations with a guideline manual which he shared with Mr. Stanford, Caillier

testified no one discussed the (c)(1) cross reference with him before the plea hearing.

[Rec. Doc. 111, pp. 266-267].  However, he was told by the court in the plea colloquy

that the court would not be able to determine his guideline sentence until after the PSR

was completed and that  the district court has the authority to impose a sentence more

severe than that called for in the guidelines. [Joint Ex. 5, pp. 18-19].

Although Mr. Lopez never appeared on a single pleading, nor did he ever make

a formal appearance on the record, nor did he ever make a single substantive statement

to the court, Caillier testified that he considered Mr. Lopez to be his "lead attorney."

[Rec. Doc. 111, p. 269]. This Court notes that, not only was this statement made after

Mr. Lopez testified he made a prediction as to Caillier's sentence, it is contradicted by Caillier's statements at the time of the plea colloquy and the indications contained in the plea packet. [Joint Ex. 4, p. 4; Joint Ex. 5, pp. 10-11].

Contrary to his signed representations contained in the plea agreement, Caillier testified he only read "the first part" of the plea agreement. [Rec. Doc. 112, p. 9].  In the plea colloquy, the AUSA provided a synopsis of the plea which included the statements "He knows the maximum penalty . . .He knows the district judge decides what the sentence is going to be." [Joint Ex.5, p. 24].  Caillier testified he did not recall discussing the plea agreement with counsel of record, however, in the plea agreement, signed by Caillier and both counsel of record, there are multiple representations that the plea agreement was discussed with Caillier by his attorneys. [Rec. Doc. 112, p. 9, Joint Ex. 4, p. 4].

According to Caillier, Mr. Guillory and Mr. Lopez told him not to voice any objection to the factual basis "in order to get the plea." [Rec. Doc. 112, p. 10].  Mr. Guillory emphatically denied ever telling Caillier, or anyone else, to lie to the court if it would benefit them. [Rec. Doc. 111, p. 145].   Mr. Lopez did not testify that he ever made such a statement, rather, his testimony was that he was not involved in the plea negotiations as that was left "completely" to Mr. Guillory, nor was he involved in the preparation of the factual basis. [Rec. Doc. 111, p. 168].

The court questioned Caillier at the time of the plea: "Did you, as charged in the Bill of Information, receive child pornography in interstate commerce?" and his answer was yes. [Joint Ex. 5, p. 20]. At the time of the evidentiary hearing, other than the legal disagreement over whether the pictures were 'sexually explicit' so as to constitute pornography, Caillier did not refute the elements of the offense charged in the Bill of Information and contained in the plea packet. [Rec. Doc. 112, pp. 5-8]. In addition, Caillier testified at the plea colloquy when asked to explain the charge to which he was pleading guilty, "That in use of a cell phone, which is an interstate commerce facility, that I did receive images or depictions that fall under the guidelines of child pornography." [Joint Ex. 5, p. 14].

When Caillier received the PSR with the recommendation to apply the (c)(1) cross reference, he outlined his factual objections, in writing, for his attorneys. [Rec. Doc. 112, p. 17]. He believed Mr. Lopez prepared the objections, however, Mr. Stanford filed the objections. [Rec.Doc. 112, pp. 17, 20, 23]. (Both Mr. Lopez and Mr. Stanford testified that Mr. Stanford prepared the objections.) Caillier testified he saw the objections at the time of sentencing, but had no discussions with his attorneys about whether they should be dropped and did not know they were going to be dropped until after the sentencing hearing had started. [Rec. Doc. 112, p. 23-24]. Caillier testified he did not give his permission to have the objections dropped. [Rec.

Doc. 112, p. 24].

Finally, Caillier testified that had he known about the (c)(1) cross reference at the time of his plea he would have gone to trial and not entered into the plea agreement. [Rec. Doc. 112, p. 26]. His reasoning was that even if he had gone to trial and been found guilty of the worst possible charge, the guideline calculation would have come up to the same range. [Id.][5] Caillier testified had he been found guilty of production of child pornography he would have had the exact same calculation - a statement that is belied by the fact that he would have faced a mandatory minimum term of imprisonment of 15 years as he was charged under 18 U.S.C. § 2251(a). [Rec. Doc. 112, p. 26].

Despite being given an opportunity to speak to the court before sentencing, Caillier did not say anything concerning the inaccuracy of the factual basis until after he knew his sentence. He testified that it was the "first opportunity" to speak to the court, however, this testimony is also inaccurate as, after he knew the (c)(1) cross reference was going to apply based on the district court's ruling, he made a lengthy personal statement to the court in which nothing was brought up concerning the

---

[5]     This Court has not undertaken any guideline computation on its own but notes here that the maximum possible penalty for Count I of the indictment is a mandatory minimum term of imprisonment of 15 years, and  Count II is a mandatory minimum term of imprisonment of 10 years up to life. See 18 U.S.C. §§ 2251(a), 2422(b).

alleged inaccuracy of the factual basis. [Rec. Doc.112, pp. 27-28].

Caillier agreed that the decision not to withdraw his plea, after having been given the opportunity to do so with the advice of newly appointed counsel, was a "mutual decision" based on the information given to him by Mr. Blanchard. [Rec. Doc. 112, pp. 29-30].   Caillier testified, however, that Mr. Blanchard had private "conversations" with the district court as to what the outcome might be if the motion to withdraw was filed which this Court does not find credible. [Rec. Doc. 112, pp. 29-30].

A notice of appeal was timely filed by Mr. Blanchard and Mr. Aberle was substituted as counsel of record for Mr. Blanchard.  Caillier testified that he did ask Mr. Aberle to appeal the application of the cross reference, and the evidence supports that testimony. [Rec. Doc. 111, pp. 246-247]. There is no evidence provided as to why Mr. Aberle did not appeal the application of the cross reference. [Rec. Doc. 112, p. 91].

Under cross examination by the Government, Caillier repeatedly asserted that his current version of the events at issue is true in contradiction to the testimony of his counsel of record, his own testimony under oath at the time of the plea colloquy, his statements in the plea packet,  and the evidence in this record. [Rec. Doc. 112, pp. 40-68, 75-88].  Ultimately, when asked whether, at the time of the plea colloquy, he was

"willing to lie so that [he] could get between zero and five years" Caillier responded

"yes." [Rec. Doc. 112, pp. 48].

### *Applicable Law and Discussion*

### *Scope of §2255 Relief*

Following conviction and exhaustion or waiver of the right to direct appeal, the

court presumes that a defendant stands fairly and finally convicted. *United States v.*

*Cervantes*, 132 F.3d 1106, 1109 (5th Cir.1998) citing *United States v. Shaid*, 937 F.2d

228, 231–32 (5th Cir.1991) (en banc) *cert. denied* 502 U.S. 1076 (1992); *see also*

*United States v. Willis*, 273 F.3d 592, 595 (5th Cir.2001).  The scope of relief afforded

under 28 U.S.C.A.§2255 is narrow.  It is "reserved for transgressions of constitutional

rights and for a narrow range of injuries that could not have been raised on direct

appeal and would, if condoned, result in a complete miscarriage of justice." *United*

*States v. Vaughn*, 955 F.2d 367, 368 (5th Cir.1992); *United States v. Acklen*, 47 F.3d

739, 741 (5th Cir.1995); *United States v. Segler*, 37 F.3d 1131, 1133 (5th Cir. 1994).

"We apply this rigorous standard in order to ensure that final judgments command

respect and that their binding effect does not last only until "the next in a series of

endless post-conviction collateral attacks." *United States v. Shaid*, 937 F.2d at 231-

232.

Section 2255 provides four grounds for relief:

-36-

1.      that the sentence violates the Constitution or other federal law;

2.      that the court lacked jurisdiction;

3.      that the sentence exceeded the maximum allowed by law; or

4.      that the sentence is otherwise "subject to collateral attack."

28 U.S.C. §2255.

"Issues raised and disposed of in a previous appeal from an original judgment of conviction are not considered in §2255 motions." *United States v. Jones,* 614 F.2d 80, 82, (5th Cir. 1980); *United States v. Kalish*, 780 F.2d 506, 508 (5th Cir. 1986) *cert. denied,* 476 U.S. 1118 (1986)*; United States v. Segler*, 37 F.3d at 1134. Likewise, the failure to raise a claim at trial or on appeal generally results in a waiver of the claim. *United States v. Frady*, 456 U.S. 152, 162-166 (1982). "A defendant may not raise an issue [constitutional or jurisdictional in nature] for the first time on collateral review without showing both 'cause for his procedural default, and 'actual prejudice' resulting from the error." *United States v. Segler,* 37 F.3d. 1133 quoting *United States v. Shaid*, 937 F.2d at 232. This "cause" and "prejudice" test must be satisfied even if the defendant alleges fundamental constitutional error. *Murray v. Carrier*, 477 U.S. 478, 493, 106 S.Ct. 2639, 2648, 91 L.Ed.2d 397 (1986).

There are three recognized exceptions to the cause and prejudice requirement:

1.      In "extraordinary cases" where a constitutional error has probably

-37-

resulted in the conviction and incarceration of someone who is actually innocent (*United States v. Carrier*, 477 U.S. at 496; *United States v. Shaid*, 937 F.2d at 232);

2.      When the government fails to object to the consideration of newly raised issues (*United States v. Gaudet*, 81 F.3d 585, 589 (5th Cir. 1996); and

3.      For certain constitutional claims that may only be adequately addressed on collateral attack, such as ineffective assistance of trial counsel. *United States v. Riascos*, 76 F.3d 93, 94-95 (5th Cir. 1996).

"If the error is not of constitutional or jurisdictional magnitude, the defendant must show the error would result in a complete miscarriage of justice." *United States v. Segler*, 37 F.3d at 1133, *United States v. Schaid,* 937 F.2d at 232 n.7.

## GROUND ONE: Whether the images at issue constitute child pornography.

In his appeal to the Fifth Circuit, Caillier asserted that the sole photograph showing the victim's genitals or pubic area did not qualify as the "lascivious exhibition of the genitals or pubic area of any person," as set out in 18 U.S.C. §2256(2)(A)(v) which defines "sexually explicit conduct."  Caillier acknowledges that the question was considered by the appellate court, but nonetheless contends the issue should be re-visited because the Fifth Circuit reviewed the issue only for plain error:

> [W]hat has not been done in this case is for a trier of fact (a judge or a jury) to make a determination of whether the images (and in particular the fourth image) meet the statutory and jurisprudential definitions of

child pornography.  Without such determination being made by a trier of fact, CAILLIER has not had his "day in court." [Rec. Doc. 85-2, p. 12].

In applying the plain error standard in accordance with *Puckett v. United States*, 556 U.S. 129 (2009), the court of appeal analyzed the photographic images themselves, using the same '*Dost*' factors cited and relied upon by Caillier in brief.[6] While Caillier asserts that the *Dost* factors "leave no doubt" that the images at issue do not present lascivious exhibition, the appellate court conducted the same analysis to conclude that Caillier failed to show clear or obvious error on the issue. [Rec. Doc. 78, p. 3] Since this issue was raised and disposed of on direct appeal of the judgment of conviction, it should not be considered in this §2255 motion.[7]   Therefore, the undersigned recommends the motion be denied as to this ground.

### GROUND TWO: *Alleged Misapplication of the Sentencing Guidelines*

---

[6]    In *United States v. Dost*, 636 F.Supp. 828, 832(S.D.Cal.1986), aff'd, 813 F.2d 1231(9th Cir. 1987), the court set out six factors to be considered in assessing whether an image contains a lascivious exhibition: (1) whether the focal point of the visual depiction is sexually suggestive; (2) whether the setting of the visual depiction is sexually suggestive; (3) whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the chid's age; (4) whether the child is fully or partially clothed, or nude; (5) whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity; and (6) whether the visual depiction is intended or designed to elicit a sexual response in the viewer.  These factors have been adopted by the Fifth Circuit.  *See United States v. Steen*, 634 F.3d 822, 826-27(5th Cir. 2011) (analyzing Dost factors to determine whether depictions meet definition of lascivious exhibition of the genitals or pubic area).

[7]    Caillier's argument on this issue in the supporting memorandum is nearly identical to the argument made to the Fifth Circuit in the Appellant's Brief. [Rec. Doc. 90]

Caillier contends that the cross reference found in U.S.S.G. §2G2.2(c)(1)[8] should not have been applied by the district court as the facts did not warrant such application.  This issue was not raised on appeal. Non-constitutional claims that could have been raised on direct appeal, but were not, may not be asserted in a collateral proceeding. *United States v. Vaughn*, 955 F.2d at 368. "Section 2255 motions may raise only constitutional errors and other injuries that could not have been raised on direct appeal that will result in a miscarriage of justice if left unaddressed. . . . Misapplications of the Sentencing Guidelines fall into neither category and hence are not cognizable in §2255 motions."  *United States v. Williamson*, 183 F.3d 458(5th Cir. 1999); *United States v. Segler*, 37 F.3d at 1134, *United States v. Faubion*, 19 F.3d 226, 233 (5th Cir. 1994).

Caillier could have raised this issue on appeal but he did not. Therefore, it is not cognizable in this motion on this basis, and while the undersigned recommends the motion to vacate on this ground be denied, that does not preclude an out of time appeal based on ineffective assistance as set forth below.

---

[8]        The Cross Reference provides:
(1) If the offense involved causing, transporting, permitting, or offering or seeking by notice or advertisement, a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct, apply § 2G2.1 (Sexually Exploiting a Minor by Production of Sexually Explicit Visual or Printed Material; Custodian Permitting Minor to Engage in Sexually Explicit Conduct; Advertisement for Minors to Engage in Production), if the resulting offense level is greater than that determined above. USSG, §2G2.2, 18 U.S.C.A.

**GROUND THREE: The Ineffective Assistance Claims**

Caillier claims that his district court counsel were ineffective for three reasons: (1) his attorneys failed to advise him about the possible application of the (c)(1) cross reference which increased his sentence range; (2) his attorneys advised him that his sentence would not exceed five years; and (3) he was advised by his attorneys to plead guilty, despite telling them he was not guilty, in order to get the sentence promised by the government.

Caillier contends that his appellate counsel was ineffective for failing to present a competent appeal on his behalf by not arguing the misapplication of the (c)(1) cross reference in computation of his sentence.  He asserts that he wrote more than one letter to his appellate attorney requesting that the cross reference issue be brought up on appeal. [Rec. Doc. 85-2, p. 20]. Although the referenced letters were not introduced as evidence, nor did Mr. Aberle testify, evidence was introduced in the form of a letter from Mr. Aberle in which he states: "Of course, I also intend to challenge the applicability of the 2G2.1." [Deft. Ex. 2]. That was not done and there is no indication in the evidence or the record why the challenge was not made.

To prevail on an ineffective assistance of counsel claim, a petitioner must establish two things: (1) his attorney's representation fell below an objective standard

of reasonableness; and (2) there is a reasonable probability that, but for his counsel's deficient performance, the outcome of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-688 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Because both *Strickland* factors, that of deficient performance and prejudice, must be satisfied, "there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697. In short, if the petitioner fails to make a sufficient showing as to one prong of the *Strickland* test, the other need not be considered and the two parts need not be analyzed in any particular order. *Bryant v. Scott* 28 F.3d 1411, 1415 (5th Cir. 1994); *Murray v. Maggio*, 736 F.2d 279, 282 (5th Cir. 1984).

With regard to the first prong, the burden is on the petitioner to show that counsel's representation fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688. The court's scrutiny shall be "highly deferential" and the court must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 citing *Michel v. Louisiana* 350 U.S. 91, 101 (1955).

-42-

See also *Marler v. Blackburn*, 777 F.2d 1007, 1010 (5th Cir. 1985).  A habeas court "must be careful not to second-guess legitimate strategic choices made by defense counsel which may now, under the distorting light of hindsight, seem ill-advised and unreasonable."  *Sawyer v. Butler*, 848 F. 2d 582, 588 (5th Cir. 1988).  The Fifth Circuit has described the standard as requiring counsel to "research relevant facts and law, or make an informed decision that certain avenues will not be fruitful." *United States v. Grammas,* 376 F.3d 433, 436 (5th Cir. 2004) citing *United States v. Conley*, 349 F.3d 837, 841 (5th Cir. 2003).

In the context of the issues raised in this ground of the motion, "[F]ailing to properly advise the defendant of the *maximum* sentence that he could receive falls below the objective standard required by *Strickland*. When the defendant lacks a full understanding of the risks of going to trial, he is unable to make an intelligent choice of whether to accept a plea or take his chances in court." *Teague v. Scott*, 60 F.3d 1167, 1171 (5th Cir.1995); *United States v. Grammas,* 376 F.3d at 436. (Emphasis added).

With regard to the second prong requiring proof of prejudice, the Fifth Circuit has instructed:

'[T]o prove prejudice, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' [*United States v. Conley*, 349

-43-

F.2d at 841-42.] 'And, of course, 'any amount of actual jail time has Sixth Amendment significance,' which constitutes prejudice for purposes of the *Strickland* test.' *Conley*, 349 F.3d at 842 (citing and quoting *Glover v. United States*, 531 U.S. 198, 203, 121 S.Ct. 696, 148 L.Ed.2d 604 (2001), and *United States v. Franks*, 230 F.3d 811, 815 (5th Cir.2000) (finding prejudice where defendant was sentenced under Guidelines range of 70 to 87 months instead of the proper 57 to 71 months range)). Additionally, '[o]ne of the most precious applications of the Sixth Amendment may well be in affording counsel to advise a defendant concerning whether he should enter a plea of guilty.' *Reed v. United States*, 354 F.2d 227, 229 (5th Cir.1965).

*     *     *

We hold that *Glover* abrogates the significantly less harsh test, and that *any* additional time in prison has constitutional significance.

*United States v. Grammas*, 376 F.3d at 436, 438, see also *United States v. Rivas-Lopez*, 678 F.3d 353, 356-357 (5th Cir. 2012).

The *Grammas* court noted that the "any amount of jail time" test only applies in cases involving the federal sentencing guidelines. *Id.* at 438, fn. 4 citing *Daniel v. Cockrell*, 283 F.3d 697, 706-07 fns. 16 & 17 (5th Cir. 2002) *overruled on other grounds Glover v. United States,* 531 U.S. 198, 203 (2001).

Also at issue in this Court's analysis is the voluntariness of Caillier's plea based on his allegations of promises or guarantees as to what his sentence might be. "To obtain federal habeas relief on the basis of alleged promises, a petitioner must prove that he was promised 'an actual sentencing benefit' by showing (1) the exact terms of the alleged promise, (2) exactly when, where, and by whom the promise was made, and (3) the precise identity of an eyewitness to the promise." *Bond v. Dretke,* 384 F.3d

-44-

166, 168 (5th Cir. 2004) quoting *Daniel v. Cockrell,* 283 F.3d 703.

In *Daniel v. Cockrell*, the court provided the distinction between actual guarantees that may provide a basis for habeas relief versus inaccurate predictions that do not:

> Where a defendant can show that the court, the prosecutor or defense counsel induced his guilty plea by clearly and unequivocally *guaranteeing* a lesser sentence or some other specific leniency, the guilty plea is not voluntary unless the defendant receives that which he was promised.
>
> *   *   *
>
> A guilty plea is not rendered involuntary by the defendant's mere subjective understanding that he would receive a lesser sentence. In other words, if the defendant's expectation of a lesser sentence did not result from a promise or guarantee by the court, the prosecutor or defense counsel, the guilty plea stands. See *Spinelli v. Collins*, 992 F.2d 559, 561-62 (5th Cir.1993) (defendant's mistaken belief that he would be eligible for parole after five years did not render his guilty plea involuntary because his misunderstanding did not result from promise by court, prosecutor or defense counsel).
>
> Likewise, a guilty plea is not rendered involuntary because the defendant's misunderstanding was based on defense counsel's inaccurate *prediction* that a lesser sentence would be imposed. See *Harmason v. Smith*, 888 F.2d 1527, 1532 (5th Cir.1989) (defense counsel's statement that the defendant would probably receive less than a fifteen year sentence did not render the guilty plea involuntary because a "prediction, prognosis, or statement of probabilities ... does not constitute an 'actual promise'."); *United States v. Stumpf*, 827 F.2d 1027, 1030 (5th Cir.1987) ("a defendant's reliance on his attorney's erroneous prediction of leniency is not sufficient to render a guilty plea involuntary."); *Self v. Blackburn*, 751 F.2d 789, 793 (5th Cir.1985) (defense counsel's statement that parole would be probable after 10 1/2 years did not render the guilty plea involuntary because it was a mere prediction, not a guarantee); *Johnson*

*v. Massey*, 516 F.2d 1001, 1002 (5th Cir.1975) ("Petitioner's allegation of a breached bargain is premised on the alleged statement to him by his own attorney that the sentencing judge generally gave sentences of about 20 years in second degree murder cases and that petitioner, as a first offender, might expect such a sentence. However, a good faith but erroneous prediction of a sentence by a defendant's counsel does not render the guilty plea involuntary.").

*Daniel v. Cockrell,* 283 F.3d 703-04. (Emphasis in original)

Against these standards each of the claims of ineffectiveness are measured in light of the record as it existed at the time of the plea/sentencing supplemented by the evidence adduced at the hearing.

### *The Alleged Failure to Advise of the possible application of the U.S.S.G. §2G2.2(c)(1) cross reference:*

In *United States v. Rivera,* 898 F.2d 442, 447 (5th Cir. 1990), the court provided the framework under which this issue is to be analyzed:

> The Constitution requires that a defendant be advised and understand the consequences of a guilty plea. "The consequences of a guilty plea, with respect to sentencing, mean only that the defendant must know the maximum prison term and fine for the offense charged. As long as the [defendant] 'understood the length of time he might possibly receive, he was fully aware of his plea's consequences.' " *Barbee v. Ruth*, 678 F.2d 634, 635 (5th Cir.), cert. denied, 459 U.S. 867, 103 S.Ct. 149, 74 L.Ed.2d 125 (1982) (quoting *Bradbury v. Wainwright*, 658 F.2d 1083, 1087 (5th Cir.1981), cert. denied, 456 U.S. 992, 102 S.Ct. 2275, 73 L.Ed.2d 1288 (1982)).
>
> *        *        *
>
> The Sentencing Guidelines make no change in substantive penalties and

do not prevent counsel from advising a defendant of what the law provides. The Guidelines do not provide for "mandatory" minimum penalties depending on the level of the offense. Rather, the sentencing ranges specified in the Guidelines are designed to provide a structure for case analysis so as to minimize disparate sentencing on like facts. A trial court may depart from the Guidelines if it finds "an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the ... guidelines," and if it states specific reasons explaining its departure. Guideline § 5K2.0; *United States v. Campbell*, 878 F.2d 164, 165 (5th Cir.1989). Rivera was well aware that the offense to which he pled guilty carried a possible maximum sentence of twenty years. Although Rivera obviously expected to receive a lesser sentence than the one imposed, the inability of Rivera's counsel to correctly predict the sentence does not constitute ineffective assistance of counsel.[9]

The crime to which Caillier pled guilty carries a mandatory minimum prison term of five years up to a maximum of twenty years. The transcript of the plea hearing establishes that Caillier, who has a college degree, specifically acknowledged that he signed the Affidavit of Understanding of Maximum Penalty and Constitutional Rights [Joint Ex. 4; see also Rec. Doc. 50-1]; acknowledged his understanding of the maximum possible penalty which was read to him  in open court;  acknowledged talking with his attorneys about how the sentencing guidelines might apply to his case; acknowledged his understanding that there was a mandatory minimum five-year term of incarceration in his case; and acknowledged that nobody had made any prediction,

---

[9]     See also *United States v. Jones* 905 F.2d 867, 868 (5th Cir. 1990) in which the court stated that erroneous guideline advice from defense counsel does not constitute a violation of Rule 11 or render a guilty plea unknowing or involuntary.

promise or prophecy as to what his sentence might be. [Joint Ex. 5, pp. 7,9,15, 18-20].

The plea colloquy fully complied with Fed. R. Crim. P. Rules 11(b)(1)(H) and (I) in terms of advising Caillier of the maximum possible penalty, including imprisonment, fine, term of supervised release and the mandatory minimum penalty. See also *United States v. Hughes*, 726 F.3d. 656, 661 (5th Cir. 2013).

Caillier further acknowledged his understanding that his precise guideline sentence could not be determined until after the completion of the PSR and the time for the government and the defendant to challenge the facts reported by the probation officer in the report.  He also confirmed his understanding that, after it was determined what guidelines would apply to his case, the district judge had the authority to impose a sentence either more severe or less severe than the sentence called for in the guidelines and that he would still be bound by his plea if the sentence was more severe than expected. [Joint Ex. 5, pp. 19-20].

Contrary to Caillier's  allegations and his testimony at the hearing, Caillier's counsel of record consistently testified that Caillier was advised of the maximum sentence, and while there was a five year minimum mandatory sentence, the judge alone decided what the sentence would be.  Mr. Guillory testified that the guidelines were explained to Caillier and was "certain" the (c)(1) cross reference was explained. With the exception of Caillier's testimony at the evidentiary hearing which this Court

does not find credible, the record is replete with evidence that Caillier was informed that the maximum possible penalty was twenty years and that a guideline sentence could not be determined until after the PSR was completed.

When Caillier's PSR was released, the (c)(1) cross reference became an issue. The guidelines range was well below the statutory maximum that Caillier had been apprised of on multiple occasions. At the time the PSR was released, Caillier's attorney submitted a written objection to the inclusion and application of the cross reference. [Joint Ex. 6, pp. 18-23]. Argument on the objection was heard at the sentencing hearing. [Joint Ex. 6, pp. 3-12]. The objection was overruled. [Joint Ex. 6, p. 12]. Ultimately, Callier's sentence was at the lower end of the applicable guideline range, and therefore, is "presumptively reasonable." *United States v. Cisneros-Gutierrez,* 517 F.3d 751, 766 (5th Cir. 2008).  Caillier testified that he lied, repeatedly, in order to receive the mandatory minimum. That did not happen, however, this Court finds that he was very well informed by the court and counsel what the maximum penalty was and that  a sentence more severe than the mandatory minimum could be imposed.

With regard to Mr. Lopez' testimony that he did not take the (c)(1) cross reference into account when he did his guideline computation, "a miscalculation or erroneous sentence estimation by defense counsel is not a constitutionally deficient

-49-

performance rising to the level of ineffective assistance of counsel." *Wright v. Carvajal,* 2013 WL 3778942 *1 (W.D. La. 2013) quoting *United States v. Gordon,* 4 F.3d 1567, 1570 (10th Cir. 1993); *Knight v. United States,* 37 F.3d 769, 775 (1st Cir. 1994); *United States v. Sweeney,* 878 F.2d 68, 70-72 (2nd Cir. 1989); *Thomas v. United States,* 27 F.3d 321, 326 (8th Cir. 1994); *United States v. Lambey* 974 F.2d 1389, 1395 (4th Cir. 1992); *United States v. Moya* 730 F. Supp. 35, 44 (N.D.Tx. 1990)*; United States v. Brent,* 2011 WL 2633781 *3 (N.D. Tx. 2011).

Likewise, an erroneous calculation of the applicable guideline range does not in and of itself establish prejudice in this case in light of the court's admonitions and the available range of punishment at the time of the plea. *United States v. Wilson,* 2012 WL 443974 (W.D. La. 2012); *United States v. Casey,* 2007 WL 2706269 *5 (N.D. Tx. 2007) and cases cited therein.  In addition, once a defendant enters a plea of guilty, a defendant may withdraw it before sentencing if he "can show a fair and just reason for requesting the withdrawal." Fed. R. Crim. P. 11(d)(2)(B). The district court considers the seven *Carr* factors to determine whether the defendant should be allowed to withdraw his plea.[10]  Callier did not seek to withdraw his plea before sentencing even knowing that the PSR called for the cross reference.

However, since the district court gave Caillier the opportunity to withdraw his

---

[10]     *United States v. Carr*, 740 F.2d 339, 343-44 (5th Cir. 1984).

guilty plea *after* he learned of his sentence and he chose not to take that action, he cannot show the requisite prejudice as to this claim.  Caillier's recent statement that "if, in fact, he had known about the cross reference to U.S.S.G. §2G2.1 and the increased guideline sentencing range, he would not have pled guilty but would have insisted upon going to trial" is belied by the fact that he was given an opportunity to withdraw his plea, with independent counsel advising him, *after* learning the cross reference was going to be applied and *after* the actual imposition of sentence.

Caillier's potential sentence had he not pled guilty included possible minimum mandatory sentences of ten or fifteen years up to a maximum sentence of life in prison. All of his attorneys recognized that the risk Caillier ran by not accepting a plea to receiving child pornography was extremely serious. His counsel of record testified Caillier admitted to the conduct described in the investigative reports and the evidence adduced at the hearing did not eliminate a scenario under which Caillier could have been convicted on any or all of the other counts contained in the indictment.  After consultation with newly appointed counsel, on both the legal and factual aspects, Caillier chose not to withdraw his plea. [Rec. Docs. 55,57, 112, pp. 29-30]. Thus Caillier cannot show he was prejudiced.

In addition, although this Court has found no Fifth Circuit authority, in *United States v. Martini*, 31 F.3d 781 (9th Cir. 1994), the court held that  an ineffectiveness

claim under §2255 could not be based on advice from an attorney that was not the defendant's counsel but whom the defendant chose to consult.  Similarly, in *United States v. Folds,* 31 F.3d 781 (9th Cir. 1997), the defendant was represented by an attorney who had negotiated a plea offer of 52 months. The defendant consulted another attorney, who he ultimately retained, who advised him to reject the plea and the defendant ended up pleading guilty and receiving a sentence of 108 months. Citing *Martini*, the court held that the defendant's claim that his second attorney was ineffective for recommending he reject the first plea was barred because at the time of that recommendation, the defendant was represented by his previously retained counsel.[11]

Caillier was well informed as to the *maximum* penalty and this Court finds the failure of non-enrolled counsel to consider the (c)(1) cross reference in his guideline calculation does not render Caillier's plea involuntary. Likewise, this Court finds there is no evidence that Caillier's attorneys' actions fell below an objective standard of reasonableness nor does this Court find that Caillier was prejudiced.  Therefore, this ground for ineffective assistance of counsel is without merit.

---

[11]      See also *Santosuosso v. United States,* 74 F.3d 1240 *3, (6th Cir. 1996) (unpublished);  *United States v. Ubani*  2013 WL 3357690, *1 (S.D. Tx. 2013),  *cf. Stoia v. United States,* 22 F.3d 766, 769 (7th Cir. 1994).

***The Alleged Assurance by Caillier's Attorneys that his Sentence Would Not  be More than Five (5) Years and the Alleged Advice from Caillier's Attorneys that He Should Agree to the Factual Basis for His Plea Despite His Claimed Innocence:***

Caillier next argues that his guilty plea was based on promises by his former counsel that he would be sentenced to no more than the mandatory minimum of five years and even after telling his attorneys that the factual basis was not true he was advised to agree to the factual basis in order to get the five years.  First, in his own sworn statements during his plea colloquy Callier stated:

| | |
|---|---|
| THE COURT: | All right.  Has anyone made any promise, other than those contained in the plea agreement which Mr. Walker has discussed and which you have signed, that induced you to plead guilty in this case? |
| THE DEFENDANT: | No, sir, Your Honor. |
| | *      *      * |
| THE COURT: | Have you and your attorneys talked about how the Sentencing Commission Guidelines might apply to your case? |
| THE DEFENDANT: | Yes, sir, Your Honor. |
| THE COURT: | Do you understand that there is a mandatory minimum five-year term in this case? |
| THE DEFENDANT: | I do understand that, Your Honor. |
| THE COURT: | Do you understand that the Court will not be able to determine the guideline sentence for your case until after the presentence report has |

|                     | been completed and you and the government have an opportunity to challenge the facts reported by the probation officer? |
|---------------------|---|
| THE DEFENDANT:      | Yes, sir, Your Honor, I understand that. |
| THE COURT:          | Do you also understand that after it has been determined what guideline applies to a case, the district judge has the authority in certain cases and in some circumstances to impose a sentence that is either more severe or less severe than the sentence called for by the guidelines? |
| THE DEFENDANT:      | Yes, sir, I do understand that. |
|                     | *       *       * |
| THE COURT:          | Do you understand that if the sentence is more severe than you expect, you will still be bound by your plea and you will have no right to withdraw it? |
| THE DEFENDANT:      | I understand that, too, Your Honor. |
| THE COURT:          | Has anyone made any prediction, prophecy, or promise to you as to what your sentence will be? |
| THE DEFENDANT:      | No, sir, Your Honor. |

[Joint Ex. 5, pp. 18-20].

These statements by Caillier, made under oath, contradict his current assertions about promises allegedly made by his attorneys regarding his sentence.  While a defendant's representations at the time of his guilty plea are not "invariably

-54-

insurmountable" when challenging the voluntariness of his plea, these representations, as well as any findings made by the judge accepting the plea, "constitute a formidable barrier in any subsequent collateral proceedings" and "[s]olemn declarations in open court carry a strong presumption of verity." *Blackledge v. Allison,* 431 U.S. 63, 73-74, (1977). Further, the documents signed by the defendant at the time of his guilty plea, and acknowledged by him at the plea hearing, are also entitled to "great evidentiary weight." *United States v. Abreo*, 30 F.3d 29, 32 (5th Cir. 1994).

In addition, the testimony of Caillier's counsel of record is consistent that there was no guarantee of a sentence of five years, although the mandatory minimum was discussed. Even Mr. Lopez testified he never heard anybody guarantee a sentence as part of a "pure plea bargain." While Mr. Lopez may have "told that man he is getting five years", that statement was more in the nature of a prediction as set forth in *Daniel v. Cockrell.* Mr. Lopez, who was not present at the plea hearing, testified as such, and his conduct does not give rise to a §2255 ineffective assistance claim as he was not counsel of record.

This Court finds Caillier did not meet his burden to establish a clear and unequivocal guarantee of a lesser sentence by defense counsel as the great weight of the evidence, including Caillier's own statements made at the time of the plea hearing and his executed plea agreement, contradict such an assertion.

With regard to the claim of his attorneys telling him to plead guilty when he was innocent, the testimony of all three attorneys is consistent that none of them either told Caillier, or heard anyone else tell Caillier, that he should plead guilty to something he did not do. The evidence contained in the investigative reports, the telephone records, and the statements made to Mr. Guillory do not suggest knowledge by counsel of record present at the plea colloquy that Caillier was actually innocent of the crime to which he pled guilty. Caillier's statements under oath to the court and the factual basis to which he attested as true do not suggest otherwise.

Other than a legal difference of opinion as to what constitutes "sexually explicit" for purposes of the statute, Caillier did not disagree with the elements of the crime of receiving child pornography and the evidence adduced at the hearing does not suggest he would have been acquitted of that charge.  Rather, his *sole* argument on this issue is that the (c)(1) cross reference should not have applied based on the facts he previously admitted under oath to the court and to his counsel of record. Thus, his claims of actual innocence are not directed to the crime, but rather to the enhancement.

The Fifth Circuit has distinguished between claims of actual innocence of the crime of conviction and claims of actual innocence of sentencing enhancements and has disallowed claims attacking sentence enhancements under the savings clause. See *Kinder v. Purdy*, 222 F.3d 209, 213-14 (5th Cir. 2000); *Padilla v. United States* 416

F.3d 424, 427 (5th Cir. 2005). Thus, a successful argument regarding the enhancement of his sentence would not establish that [he] was convicted of a nonexistent offense." *Austin v. Kastner*, 283 Fed. Appx. 213, 214 (5th Cir. 2008) citing *Padilla,* 416 F.3d 427.

This Court finds that Caillier has not shown that his attorneys coerced or otherwise forced him to plead guilty to a crime they knew he did not commit. Caillier, a well educated, intelligent, articulate individual who even performed his own guideline computations, was well informed of the elements of the offense to which he pled guilty. This Court finds his statements to the contrary are unsupported by the evidence and not credible. This Court finds no evidence that the conduct of the defendant's attorneys fell below an objective standard of reasonableness and recommends the motion be denied as to this ground.

***The Alleged Failure by Defendant's Appellate Counsel to Raise the Sentencing Issue on Appeal:***

The same standards articulated above apply to claims of ineffective assistance by appellate counsel.  However, as it pertains to appellate counsel, in order to demonstrate prejudice, the petitioner "must show a reasonable probability that he would have prevailed on appeal had counsel raised the omitted claims." *Willingham v. Cockrell*, 61 Fed. App'x. 918 *4 (5th Cir. 2003) (unpublished) citing *Smith v.*

*Robbins* 528 U.S. 259, 285-87 (2003).  Appellate counsel is not required to present frivolous arguments, or even to present every non-frivolous argument which could be raised, but "counsel is required to raise and brief only those issues which are believed by counsel, in the exercise of professional judgment, to have the best chance of success. *Id.*, citing *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983).

Caillier's appellate counsel raised a single issue on appeal.  He argued that Caillier could not be guilty of receiving child pornography unless the images he received depict a lascivious exhibition of the minor student's genitals or pubic area. Caillier contended that he also wished to appeal the application of the cross reference to enhance his sentence and that he made multiple requests to do so.  The evidence adduced at the hearing supports this contention and there is no evidence indicating why the appeal of Caillier's sentence and the application of the (c)(1) cross reference was not taken.

Thus, rather than being faced with an argument that was discussed between counsel and client and not raised on appeal for specific reasons, this Court is faced with what the evidence demonstrates was a clear indication of a desire to appeal an issue by the defendant that was not done for reasons unknown to this Court. When an attorney has consulted with the defendant regarding whether to appeal, "[c]ounsel performs in a professionally unreasonable manner only by failing to follow the

defendant's express instructions with respect to an appeal." *United States v. Pham,* 722 F.3d 320, 324 (5th Cir. 2013).  The remedy for counsel failing to follow the defendant's instruction for an appeal is to allow an out of time appeal.

This Court finds that the preponderance of the evidence shows Caillier requested an appeal of his sentence, indeed his decision not to move to withdraw his guilty plea was predicated, at least in part, on appealing his sentence and the application of the (c)(1) cross reference. Therefore, the Court recommends that the motion be granted in part to allow Caillier an out of time appeal of his sentence.

The statements in the Factual Basis for Guilty Plea, the accuracy of which Caillier swore to at his plea hearing, were that he "asked the minor for sexually explicit images of herself. . . . At the defendant's request the minor took several images of herself including sexually explicit images and sent them to the defendant." Those statements, in part,  triggered application of the cross reference.  Caillier now denies the truth of those statements and has an affidavit and testimony from the victim which supports his contention to a very limited degree. There were factual objections to the PSR which also support this contention that were  withdrawn, allegedly without Caillier's input or permission.

The second argument Caillier made at the time of sentencing was that the cross reference should not have applied because merely "requesting" the photographs does

not involve "causing. . .a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct." U.S.S.G. §2G2.2(c)(1).

Thus, there are two aspects to the argument, a factual one based on a claim of actual innocence of the enhancement, and a legal one based on whether a "request" amounts to "causing" within the meaning of U.S.S.G. §2G2.2(c)(1). This Court is cognizant that the former has been raised by this motion while the latter existed at the time of sentencing. However, based on the evidence presented, this Court does not find the evidence presented at the hearing establishes actual innocence of the conduct necessary to trigger the application of the (c)(1) the enhancement.

The victim affidavit offered by Caillier at this late date must be viewed with "extreme suspicion" by the court. *Baldree v. Johnson*, 99 F.3d 659, 663 (5th Cir. l996); *see also Graves v. Cockrell*, 351 F.3d 143, 153 (5th Cir. 2003). The telephone records which completely contradict Caillier's testimony, the clear statements made by the victim and Miss A. contemporaneous with the events that do not reflect a "poor choice of words" by the victim, and the lack of memory by Miss C. whether Caillier asked her to send completely nude photographs exposing her vaginal area, when taken in context with the (c)(1) cross reference, U.S.S.G. §1B1.3 and 18 U.S.C. §2251(e), lead this Court to conclude that the enhancement was properly applied by the district court.

The evidence adduced at the hearing, which this Court finds as fact, is that, even assuming the first four MMS images that were sent on Friday, February 5 are the photographs recovered by the Government, once Caillier had them and knew they came from his minor student, Miss C., he sent her a photograph of an adult male penis. The cell phone records, contrary to Caillier's testimony which this Court does not find credible, document over 200 text messages and over a dozen MMS messages over the next several days. Although she did not recall Caillier doing so at the time of the hearing, approximately two weeks after it occurred, Miss C. told investigators and her friend that Caillier asked her to send him pictures of her fully nude to include her vaginal area which she refused. Her affidavit does not contradict this evidence. Thus, the first statement contained in the now controverted factual basis is correct.

The (c)(1) cross reference applies to "seeking by notice of advertisement, a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct." Comment 5 to U.S.S.G. §2G2.2 provides:

> The cross reference in subsection (c)(1) is to be construed broadly and includes all instances where the offense involved employing, using, persuading, inducing, enticing, coercing, transporting, permitting, or offering or seeking by notice or advertisement, a minor to engage in sexually explicit conduct for the purpose of producing any visual depiction of such conduct. . ."

Under U.S.S.G. §1B1.3, the (c)(1) cross reference is to be determined on the

-61-

basis of "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured or willfully caused by the defendant." Finally, 18 U.S.C. §2252(b) makes it a crime to attempt to violate §2252A(a)(2)(A), and therefore, even though Miss C. refused to send the photographs of her fully nude, Caillier's act of requesting them is sufficient to trigger the cross reference. The weight of the evidence demonstrates that the (c)(1) cross reference is and has been correctly applied in this instance.

The Government has suggested that if the district court concludes that the defendant did not ask for the images as set forth in the factual basis, the plea can still stand but the defendant may be re-sentenced without consideration of that statement. [Rec. Doc. 113]. This Court does not find that re-sentencing is necessary based on the facts and evidence. If the first clause of the second statement contained in the factual basis is omitted, the (c)(1) cross reference would still apply. Thus, even assuming there is an error in the plea process as to this clause, which this Court expressly does not find, "the error is not of constitutional or jurisdictional magnitude," and Caillier has failed to "show the error would result in a complete miscarriage of justice." *United States v. Segler*, 37 F.3d at 1133, *United States v. Schaid,* 937 F.2d at 232 n.7. Therefore, this Court recommends that the sentence not be vacated and that the defendant be allowed an out of time appeal on the Judgment as it stands.

***GROUND FOUR: Whether Caillier Has Established Actual Innocence.***

Contrary to his sworn testimony and the documents he signed, Caillier asserts that he is factually innocent of the charge to which he pled guilty. [Rec. Doc. 85-2, p. 21]. In brief, Caillier offered what he described to be "the actual version of events," which differs in significant aspects from the prior versions offered by the defendant. However, Caillier admitted in the evidentiary hearing that he received by MMS message to his cell phone, four visual depictions of the minor, Miss C., in various states of undress at least one of which has been determined by the Fifth Circuit to depict her engaged in sexually explicit conduct.  This testimony is consistent with the evidence and his sworn statements at the time of the plea colloquy. Thus, this Court does not find he has established actual innocence as a factual matter, however, even assuming the contradictory affidavits/testimony as to whether he asked for the first photographs are accepted as true, that does not entitle him to the relief he seeks.

For the petitioner to make a true showing of actual innocence he must (1) present new, reliable evidence; (2) that was not presented at trial; and (3) he must show that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt. *Schlup v. Delo*, 513 U.S. 298, 327-28 (1995). Such claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional

-63-

violation occurring in the underlying criminal proceeding. This rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution—not to correct errors of fact. *Herrera v. Collins*, 506 U.S. 390, 400 (1993). Actual innocence claims provide instead, "a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Id*. at 404.

This Court has found no underlying Constitutional violation in the guilty plea or the sentence imposed. Nor does this Court find that Caillier has met his burden to establish actual innocence. Therefore, this Court recommends the motion be denied on this ground.

### GROUND FIVE:Alleged Prosecutorial Misconduct

Caillier next alleges that prosecutors denied his attorneys access to the victim during the discovery period, prohibiting contact with the victim or her family.  Caillier asserts that he learned from the minor victim and her mother that the prosecutor "banned anyone from CAILLIER's side from even talking to"[12] the minor.   Caillier waived his rights to confront and cross-examine government witnesses and to call witnesses to present evidence on his own behalf when he chose to forego a trial on the

---

[12]Although this reference appears in Defendant's brief as a quotation, no citation to a source appears in the document, and the statement does not appear in the Affidavit of the victim, attached to the brief.

merits, all of which was explained to and confirmed by him at the plea hearing. [Joint Ex. 5, pp. 11-13]. "When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea." *Tollett v. Henderson*, 411 U.S. 258, 267 (1973); *United States v. Daughenbaugh*, 549 F.3d 1010, 1012 (5th Cir. 2008).

However, even if the Court were to consider the merits of this claim, the evidence adduced at the evidentiary hearing undisputably demonstrates that the victim and her mother advised the assistant United States Attorney that they did not wish to speak with the defendant's counsel, which was within their right. The assistant United States Attorney relayed that message to defense counsel. Mr. Guillory testified he "put out feelers" to see if the victim would speak with him and received a negative response. There is no evidence that the Government precluded the defense team access to the victim.  Thus, this claim lacks merit and this Court recommends the motion be denied as to this claim.[13]

## Conclusion and Recommendation

Based on the foregoing, it is the recommendation of the undersigned that the

---

[13]      See Rec. Doc. 111 - testimony of Miss C., pp. 23, 34,49; Agent Catalan, p. 73; Miss C.'s mother, pp. 113-114, 118, 122; Mr. Guillory, pp. 137-139; Mr. Lopez,  pp. 163-166 and Mr. Stanford, p. 192.

defendant's Motion to Vacate, Set Aside, or Correct Sentence be DENIED as to Grounds One, Two, Four and Five in their entirety. As to Ground Three, it is recommended that the defendant be granted an out of time appeal on the issue of his sentence, but that the request for relief on all of the other aspects of Ground Three be denied.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Cr. P. 59(b)(2), parties aggrieved by this recommendation have fourteen days from service of this report and recommendation to file specific, written objections with the Clerk of Court.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of its service, or on a date set by the district court,  shall act to waive the party's right to review by the district court. Fed. R. Cr. P. 59(b)(2).

Pursuant to Rule 11(a) of the Rules Governing Section 2255 Proceedings for the United States District Courts, this court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.  Unless a Circuit Justice or District Judge issues a certificate of appealability, an appeal may not be taken to the court of appeals. **Within fourteen (14) days from service of this Report and Recommendation, the parties may file a memorandum setting forth arguments on whether a certificate of appealability should issue.** *See* 28 U.S.C. §

2253(c)(2). **A courtesy copy of the memorandum shall be provided to the District Judge at the time of filing.**


Signed at Lafayette, Louisiana this 21st day of April, 2014.


_____
Patrick J. Hanna
United States Magistrate Judge